UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOCELYN GEORGES,<br>    Plaintiff,<br><br>v.<br><br>PARTNERS HEALTHCARE SYSTEM, INC.,<br>A/K/A<br>MASSACHUSETTS GENERAL HOSPITAL,<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DOCKET NO. 03-12553-REK**

## PLAINTIFF JOCELYN GEORGES' MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Summary judgment is disfavored where, as here, the ultimate issue involves the presence of discriminatory intent. The plaintiff can establish a viable case and demonstrate disparate treatment by proof that the defendant treated individuals outside of the protected class in a more favorable fashion. He will prove that non-black employees with equal or worse absenteeism records were treated more leniently. Accordingly, significant questions of fact must be decided. For the reasons set forth in detail below, summary judgment should be denied.

### II. FACTS

The plaintiff, Jocelyn Georges ("Georges"), is black, came to this country from Haiti and is a United States citizen. Georges started working at Massachusetts General Hospital ("the hospital") in June of 1997. Thereafter, Georges transferred into the Patient Transport Department in October

1998 and was later terminated from the hospital allegedly for poor attendance on September 24, 2002. (See Attachment A, Georges' Affidavit, Paragraphs 1 and 2.)

At the time of his termination Georges directly reported to his supervisor, Krzystof Klincewicz ("Klincewicz"), who reported to his manager, Alphonso Viscomi ("Viscomi"). Both individuals consulted with Anne Morin ("Morin"), Human Resources Generalist for the hospital relative to disciplinary matters. All three individuals are white. (See Attachment A, Georges' Affidavit, Paragraph 3.)

During the term of his employment Georges believed Viscomi and Klincewicz treated white employees better than black employees. Georges was aware that white employees were given more overtime than black employees. He was also aware of the fact that Klincewicz tended to call black employees into his office for discipline more often than white employees. (See Attachment A, Georges' Affidavit, Paragraph 5.)

Georges believed that the hospital and the Materials Management Department were more lenient relative to discipline for absenteeism with white employees than they were of black employees. (See Attachment A, Georges' Affidavit, Paragraph 6.) Set forth below are examples of similarly situated white employees who worked for Klincewicz with far worse attendance records and who were still employed at the hospital when Georges was fired.

According to the hospital's records, Georges was fired after being absent 13 times and tardy 14 times during the relevant time period. (See pages 3 and 4.)

In contrast to Georges' record, similarly situated white employees in the same department who also reported to Klincewicz and Viscomi received much more lenient treatment relative to their attendance records. For example, John Morruzzi, who is white and is still employed by the hospital, was tardy 40 times in 2000 and was absent on 17 occasions. (See Attachment B, Klincewicz's Depo.,

pp.81, 84 and Attachment C, Exhibit 9 to Klincewicz's Depo.) In 2003 Morruzzi was absent on 52 occasions. (See Attachment B, Klincewicz's Depo., p. 85 and Attachment D, Exhibit 10 to Klincewicz's Depo.)[1]

Also, Anthony Petruzzelli ("Petruzzelli") who is white (See Attachment B, Klincewicz's Depo., p. 87.) was absent 21 times in 2000 and only received a verbal warning. (See Attachment B, Klincewicz's Depo., p. 86 and Attachment E, Exhibit 12 to Klincewicz's Depo.) In 2001 Petruzzelli was absent 9 times and in 2003 was absent 20 times. In 2003 Petruzzelli again received only a verbal warning. (See Attachment B, Klincewicz's Depo., p. 85 and Attachment F and Attachment G Exhibits in Klincewicz's Depo.) Petruzzelli still works for the hospital. (See Attachment A, Georges' Affidavit, Paragraph 6.)

Further, William Timmins ("Timmins"), a white employee, was absent 5 times and tardy 26 times in 2000. (See Attachment B, Klincewicz's Depo., p. 96.) In 2001 Timmins was absent 8 times and tardy 11 times. In 2002 Timmins was absent 9 times and tardy 7 times. (See Attachment B, Klincewicz's Depo., p. 97.) Timmins still works for the hospital. Other white employees who were eventually fired for absenteeism after Georges' termination were treated more leniently.

For example, other employees who were terminated for absenteeism received much more lenient treatment. Arthur Joyce ("Joyce"), who is also white, was absent 28 times in 2000. (See Attachment B, Klincewicz's Depo., p. 88 and Attachment H, Exhibit 13 in Klincewicz's Depo.) In 2001 Joyce was absent 47 times and still worked for the hospital up to late in the year 2002. (See Attachment B, Klincewicz's Depo., p. 87 and Attachment I, Exhibit 13.) Michael Bird ("Bird"), a white employee, was still working for the hospital at the time Georges was fired. Bird received an

---

[1] The days highlighted on the attendance sheet are days of unscheduled absence. (See Attachment B, Klincewicz's Depo., pp. 37-38.)

evaluation in July 2002 which stated on page 2, under "B" that Bird "has a poor attendance record; has used over 30 days of unscheduled ET and was on many occasions tardy." (See Attachment J, document produced by defendant, Bate Stamp 000605.)

In fact, Viscomi, Georges' manager, stated at his deposition that William Timmins, Michael Bird, Arthur Joyce all had worse attendance records than Georges at the time that Georges was fired. (See Attachment K, A. Viscomi's Depo., pp. 67-69.)

The hospital claims that Georges' absenteeism and tardy record during the relevant time period was as follows: on October 20, 2001, Georges received a verbal warning because the hospital alleged that he had been tardy on 7 occasions. (See Attachment B, Klincewicz's Depo., p. 52.) It also claims that on January 11, 2002, Georges received a written warning for being absent 4 times and late on 5 occasions. (See Attachment B, Klincewicz's Depo., p. 58 and Attachment L, Plaintiff's Exhibit 6 in Klincewicz's Depo.) On July 10, 2002, Georges received a final written warning for being tardy one time and absent 6 times. (See Attachment B, Klincewicz's Depo., p. 63 and Attachment M, Exhibit 7 in Klincewicz's Depo.) On September 24, 2002, after being absent 3 times Georges' employment was terminated. Nevertheless, Georges' attendance record indicates that during the relevant time period starting October 6, 2001 and ending September 28, 2002, the date of Georges' termination, he was absent a total of 13 times and tardy 14 times.

Georges denies that he received any counseling, any oral warning, written warning or final written warning. He does admit that on one occasion Klincewicz met with him, talked about his attendance but then in front of him Klincewicz threw away a letter addressed to Georges relative to his attendance. (See Attachment A, Georges' Affidavit, Paragraph 4.)

The hospital's attendance policy at the time of Georges' termination provided for the following progressive discipline:

a.      Counseling may occur with 3 to 6 absences;

b.      Oral warning may occur with 5 to 7 absences;

c.      Written warning may occur with 6 to 8 absences;

d.      Final written warning may occur with 9 absences; and

e.      Termination may occur with 8 or more absences.

Also the progressive discipline schedule for tardiness is as follows:

a.      Counseling may occur with 3 to 2 times late;

b.      Oral warning may occur with 5 to 11 times late;

c.      Written warning may occur with 6 to 12 times late

d.      Final written warning may occur with 7 to 13 times late; and

e.      Termination may occur with 8 or more times late.

(See Attachment B, Klincewicz's Depo., p. 45 and Attachment N, Attendance Guidelines, Materials

Management, September 1, 1998.)

In January 2003 after Georges' termination, the Attendance Guidelines were amended to

provide for the following progressive discipline:

a.      Counseling may occur with 4 absences;

b.      Oral warning may occur with 5 absences;

c.      Written warning may occur with 6 absences;

d.      Final written warning may occur with 7 absences; and

e.      Termination may occur with 8 or more absences.

Also the progressive discipline schedule for tardiness is as follows:

a.      Counseling may occur with 4 times late;

b.      Oral warning may occur with 5 times late;

c.    Written warning may occur with 6 times late

d.    Final written warning may occur with 7 times late; and

e.    Termination may occur with 8 or more times late.

(See Attachment K, A. Viscomi's Depo., p. 73 and Attachment O, Exhibit 1 of Viscomi's Depo.)

Georges' manager, Alphonso Viscomi, believed that the revised Guidelines initiated in January 2003 applied attendance discipline in a more consistent fashion.  (See Attachment K, Viscomi's Depo., p. 33.)

# III. DISCUSSION

A.    **SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE GEORGE CAN PROVE THAT SIMILARLY SITUATED INDIVIDUALS WHO WERE WHITE WERE TREATED MORE FAVORABLY RELATIVE TO THE ADMINISTRATION OF THE HOSPITAL'S ABSENTEEISM POLICY.**

The record discloses that during the relevant time period Georges had 13 unexcused absences and 14 incidences of tardiness.  Georges can demonstrate that similarly situated white employees who worked in the same department, reported to the same manager and most of whom performed the same job as Georges had far worse absenteeism records and were treated in a more lenient fashion.  For example, John Morruzzi who is still employed by the hospital was tardy 40 times in 2000 alone and had been absent on 17 occasions in that year.  In addition, in 2003 Morruzzi was absent on 52 occasions. Anthony Petruzzelli was absent 21 times in 2000 and received only a verbal warning.  In 2001 Petruzzelli was absent 9 times  and in 2003 he was absent 23 times.  In fact, during this period of time the only discipline Petruzzelli received was a verbal warning.  Petruzzelli is also still employed by the hospital.  Further, William Timmins was absent 5 times and tardy 26 times in

2000. In 2001 Timmins was absent 8 times and tardy 11 times. In 2002 Timmins was absent 9 times and tardy 7 times. In each year Timmins had more incidences of absenteeism and/or tardiness than Georges had in the year he was terminated.

In addition, other white employees were later fired for absenteeism but were given much more time to correct their attendance record. Arthur Joyce was absent 28 times in 2000. He was also absent 47 times in 2002 and was still working at the hospital at the time Georges was fired. Michael Bird in 2002 received a performance evaluation which stated that Bird "has a poor attendance record; has used over 30 days of unscheduled ET and was on many occasions tardy." Even Viscomi, Georges manager, stated that he was aware that Timmins, Bird and Joyce all had worse attendance records than Georges.

Clearly, these facts are sufficient as a matter of law to avoid summary judgment in this case.

**B.    THE FACT THAT GEORGES CAN DEMONSTRATE WITH PROBATIVE EVIDENCE THAT SIMILARLY SITUATED PERSONS OUTSIDE OF THE PRO-TECTED CLASS WERE TREATED MORE FAVORABLY RELATIVE TO ABSENTEEISM THAN HE WAS ALLOWS HIM TO DEFEAT SUMMARY JUDGMENT.**

The discriminatory enforcement of a lawful policy is unlawful if the employee can demonstrate that despite the fact that he was discharged for misconduct, his employer treated him differently than other employees not within the protected class who were also engaged in the prohibitive conduct. *See, Anderson v. Savage Lab, Inc.*, 675 F. 2d, 1221, 1224-25, (11th Circuit, 1982) (holding that the discharge of an older employee assertedly for a violation of a company rule is unlawful when the employee can prove that employer's proffered reason is a pretext for age discrimination by demonstrating that younger employees who engaged in similar conduct were not

similarly punished.) *Flynn v. Raytheon Company*, Mass. 1994, 868 F. Supp. 383 (Court denied Raytheon's motion to dismiss because plaintiff, an alcoholic, whose employment was terminated when he showed up to work intoxicated can establish selective enforcement of the company policy on the basis of his disability.)

In fact, the most probative means of establishing that the plaintiff's termination is pretext for discrimination is to demonstrate that similarly situated white employees were treated differently. *Smith College v. Massachusetts Commission Against Discrimination,* 376 Mass., 221, 228 (1978). *See, Petsch-Schmid v. Boston Edison Co.,* 1914 F. Supp. 697 (Mass. 1996) (where plaintiff could point to six men outside the protected class with arguably equivalent salaries and responsibilities who did not receive comparable discipline despite work problems at least as severe as those attributed to plaintiff.)

Here, the plaintiff can point to three white individuals with worse attendance records who were not fired and two white individuals who, although later fired, were given considerably more leniency in the administration of the discipline policy.

Indeed, it is clear that the individuals in the unprotected class were similarly situated. They all reported to the same supervisor, were indirectly under the supervision of the same manager, were subject to the same absenteeism policy and many of them performed the same duties. Accordingly, based on this direct evidence of disparate treatment, the law provides that the Court at least for purposes of summary judgment should find that the hospital's reasons were pretextual and that questions of fact exist which defeats the defendant's motion for summary judgment.

**C.    THE FACT THAT THE HOSPITAL CHANGED ITS ATTENDANCE POLICY IN ORDER THAT THE POLICY WOULD BE APPLIED MORE CONSISTENTLY AMONGST THE EMPLOYEES IS EVIDENCE OF ITS INCONSISTENT APPLICATION DURING THE TERM OF GEORGES' EMPLOYMENT.**

The record reflects that the hospital attempted to tighten its attendance policy after the time that Georges was terminated. Viscomi, who took part in the revision of the administrative policy after Georges' termination, admitted that the changes allowed a more consistent application for discipline relative to attendance. Essentially, what the revised policy did was take discretion away from the managers and substituted in many cases a single number of absences or tardiness to invoke the various progressive discipline, e.g., before 2003 a written warning may occur with 6-8 absences; after 2003, a written warning many occur with 6 absences.

For purposes of summary judgment such a change should constitute admission on the hospital's part that it was not applying its attendance policy in a uniform and consistent manner at the time it fired Georges.

**D.    THERE IS A STRICT STAND FOR SUMMARY JUDGMENT WHERE QUESTIONS OF DISCRIMINATORY INTENT ARE INVOLVED.**

A court can grant summary judgment only "if the pleadings, depositions, answers to interrogatories and admissions are on file together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). The trial court should accept the properly documented facts that are most favorable to the non-movant, resolving all genuine conflicts in his favor while at the same time refusing to indulge rank speculation or unsupported hyperbole. *Mesnick v. General Electric,* 950 F. 2d at 822 (1st Circuit 1991)  Where, as is here, the ultimate issue of discriminatory intent is a

factual question, the ultimate question of the defendant's state of mind is elusive and rarely is established by other than circumstantial evidence which requires a jury to weigh the credibility of conflicting explanations of the adverse employment decision. *Blare v. Huffy Injection Molding System Boston, Inc.,* 419 Mass. 437 (1995). Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment. *Petsch-Schmid v. Boston Edison Co.,* 914 F. Supp. 697 (Mass. 1996). Accordingly, summary judgment should be denied in this case.

## IV. CONCLUSION

For all of the above reasons, summary judgment should be denied.

Respectfully submitted,

PLAINTIFF, JOCELYN GEORGES
By his attorney,

John D. Corrigan/BBO No. 100460
O'MALLEY AND HARVEY, LLP
Two Oliver Street, 9th Floor
Boston, MA  02109-4908
TEL:   617-357-5544
FAX:   617-204-3477

A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOCELYN GEORGES,                                )
    Plaintiff,                              )
                              )
                              )
v.                                              )          **DOCKET NO. 03-12553-REK**
                              )
PARTNERS HEALTHCARE SYSTEM, INC.,               )
A/K/A                                           )
MASSACHUSETTS GENERAL HOSPITAL,                 )
    Defendant.                              )

## AFFIDAVIT OF JOCELYN GEORGES
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.     My name is Jocelyn Georges. I live at 189 Harvard Street, Cambridge, Massachusetts. I am black. I was born on March 7, 1955 in Haiti. I came to the United States in 1986, and I am now a United States citizen.

2.     I commenced working at Massachusetts General Hospital ("the hospital") in 1997. In 1998 I transferred into the Patient Transport Department. On September 24, 2002 I was terminated for alleged poor attendance.

3.     The decision to terminate me was made by my manager, Alphonso Viscomi; my supervisor, Krzystof Klincewicz and Human Resources Generalist, Anne Morin. All of these individuals are white.

4.     The hospital claimed that prior to my termination that I was counseled, received a verbal warning, received a written warning and received a final written warning before my termination relative to my absenteeism record. This is not true. I was not counseled, did not

receive a verbal warning and on only one occasion before my termination did I have a meeting with my supervisor, Krzystof Klincewicz relative to my absenteeism record. At that meeting Klincewicz had a typed letter which he threw into the wastebasket.

5.    While I worked for Mr. Viscomi and Mr. Klincewicz, they treated white people differently than blacks. White people continually were awarded more overtime than black people. In addition, Mr. Klincewicz had a tendency to call more black people into his office for discipline than he did white people. Further, white people tended to get promotions ahead of black people.

6.    Also, people such as Bill Timmins, John Morruzzi and Anthony Petruzzelli in my department with worse absenteeism records than myself at the time of my termination were not terminated. All of these individuals were white, reported to Mr. Klincewicz and still work for the hospital. Further, Michael Bird and Arthur Joyce, who were still employed at the hospital when I was fired, were also white and had far more absences than I did at the time of my termination. Consequently, I believe that as far as the hospital's absenteeism policy is concerned, black people were treated less favorably than white people.

7.    In conclusion, I believe that my termination for absenteeism constituted discrimination based on the fact I am black.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 10TH DAY OF DECEMBER, 2004.

Jocelyn Georges

E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOCELYN GEORGES,                              )
    Plaintiff,                               )
                                             )
v.                                           )          **DOCKET NO. 03-12553-REK**
                                             )
PARTNERS HEALTHCARE SYSTEM, INC.,            )
A/K/A                                        )
MASSACHUSETTS GENERAL HOSPITAL,              )
    Defendant.                               )

## AFFIDAVIT OF JOHN D. CORRIGAN

I, John D. Corrigan, attorney for the plaintiff, Jocelyn Georges, hereby certify that the following documents contained herein are excerpts from the deposition of Krzysztof Klincewicz.

SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 9TH DAY OF DECEMBER, 2004.

_____
John D. Corrigan

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 03-1243-REK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JOCELYN GEORGES,
     Plaintiff,

vs.

PARTNERS HEALTHCARE SYSTEM, INC.,
A/K/A
MASSACHUSETTS GENERAL HOSPITAL,
     Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

     DEPOSITION OF KRZYSZTOF KLINCEWICZ, a

witness called on behalf of the Plaintiff,

pursuant to Massachusetts Rules of Civil

Procedure, before G. Maggie Smith, Registered

Professional Reporter, Certified Shorthand

Reporter, No. 816376 and Notary Public in and for

the Commonwealth of Massachusetts, at the Offices

of O'Malley and Harvey, Two Oliver Street, Boston,

Massachusetts 02109-4908 on Thursday, October 28,

2004, commencing at 10:16 a.m.

**SMITH COURT REPORTING SERVICE**
335 KING STREET
HANOVER, MA 02339
Tel. (781) 878-0097 \* Fax (781) 982-6725

1      talking about?

2   A.  I'm sorry.  I get your point now.  Correct.  The

3       date would be November 9th, not November 10th as I

4       said, yes.

5   Q.  All right.  It's a Friday.  Right?

6   A.  Correct.

7   Q.  I'm just trying to understand the symbols.  That's

8       all.

9   A.  Correct, yes.

10  Q.  Now, how do we know that was an unscheduled

11      absence or if it is unscheduled absence?

12          MS. ROACH:  Objection.

13          You can answer.

14  A.  Well, as I said, this would be created based on

15      the sign-in logs and I'm pretty confident that if

16      I went to sign in and out, on the payroll sheets

17      it would be marked as unscheduled time off.

18  Q.  Okay.  So am I correct then in drawing the opinion

19      that if you believe it's unscheduled, then you'd

20      mark it in red or the individual doing this

21      document?

22  A.  Correct.

23  Q.  So the mere fact it is highlighted would indicate

24      to you that it was unscheduled?

1  A.  Yes, it would indicate there was a problem with

2       this record.

3  Q.  And if it had been, say, vacation time, scheduled

4       time out, you would just put an 8 in there?

5           MS. ROACH:  Objection.

6           You can answer.

7  A.  It would be 8 and lettering ET, earned time.

8  Q.  So earned time meaning vacation or whatever the

9       case?

10 A.  Yes.

11 Q.  Excused absence.  Is that fair to say?

12          MS. ROACH:  Objection.

13          You can answer.

14 A.  Correct.

15 Q.  So looking at this sheet which is marked

16      Exhibit 2, is there any vacation time recorded for

17      the year 2002?

18 A.  Well, I believe that there is one day,

19      December 25th, I believe, that that's what it

20      states, 8, ET.

21 Q.  Okay.  Hold on just one sec.  That would be the

22      week ending 12/29.  Right?

23 A.  Correct.

24 Q.  And it would be a Tuesday?

1    A.    I understand.

2    Q.    Does that mean he'd have ten absences?

3    A.    Correct.

4    Q.    Okay.

5             MR. CORRIGAN:  Can I ask that document,

6    Attendance Guidelines, Bates stamped 00074 be

7    marked as Exhibit 3?

8             (Exhibit No. 3, Attendance Guidelines

9             Bates Stamped 00074, marked for ID.)

10   Q.    Now, do you see the writing on Exhibit 2 which

11   says, "10/20/01 oral warning, attendance" on the

12   bottom of the document?

13   A.    Yes.

14   Q.    Is that your writing?

15   A.    No, that's not my writing.

16   Q.    Do you know who entered that?

17   A.    Do I know who wrote it?

18   Q.    Yes.

19   A.    Yes, I do.

20   Q.    Who wrote it?

21   A.    Lisa Martino.

22   Q.    And is she a group leader?

23   A.    She is a supervisor.

24   Q.    Oh, she's a supervisor.

1    A.    Well, I have to look at two because the fiscal

2          year ends in September, so I have to look at

3          September and December of next --

4    Q.    Those are exhibits what?

5    A.    Exhibit No. 2 and No. 5.

6    Q.    All right.  Now, looking at those two exhibits, on

7          what occasions was Mr. Jocelyn late that prompted

8          the oral warning?

9    A.    He was late on September 27, on September 28, on

10         October 4, on December 12.

11   Q.    What indicates to you which days he was late?

12         What's on that record?

13   A.    Um, the entries would be 7.5 instead of 8.

14   Q.    And, okay.  So we are looking at, first you're

15         looking at Exhibit 2.  Is that right?

16   A.    Correct.  And then Exhibit 5.

17   Q.    And Exhibit 2 is 2000?

18   A.    2002.

19   Q.    2002.  And you are also looking at what,

20         Exhibit 3?

21              MS. ROACH:  5.

22   A.    5.

23   Q.    Exhibit 5, okay.

24              Now, before you gave Mr. Georges the oral

58

1   Q.   Okay.  Now, can you tell me what it was that

2        prompted you to give Mr. Georges the written

3        warning?

4   A.   Um; after the verbal warning I had numerous

5        discussions with him.  Unofficially, kind of off

6        line I would tell him that this is something that

7        concerns me and if this continues I would have to

8        give him the next step of corrective action.  And

9        he missed, according to this, four days and was

10       late on five occasions and that prompted me to the

11       decision.

12   Q.   All right.  So you gave him the written warning,

13       as I understand it, and correct me if I'm wrong,

14       because he had been late how many days?

15   A.   Four days.

16   Q.   All right.

17   A.   And he was absent.  And he was late on five days.

18   Q.   All right.  Now before you did this, did you talk

19       to anybody?

20   A.   As I stated before, it had to be discussed with

21       the HR generalist.

22   Q.   How about your manager?

23   A.   Um, I don't recall specific discussions with him

24       regarding this, but it is possible that I

1      her for review.

2  Q.  Okay.  Fax the document itself to her for review?

3  A.  Email it to her.

4  Q.  But email contained this document that we are

5      looking at now?

6  A.  Yes, it was an attachment of an email.

7          MS. ROACH:  Corrective Action Final Written

8      Warning dated July 11, '02.  I think that's

9      Exhibit 7.

10         (Exhibit No. 7, Corrective Action Final

11         Written Warning Dated 7/11/02, marked

12         for ID.)

13  Q.  Okay.  I'm looking at Exhibit 7, sir.  And this

14      document said the document was presented on

15      7/10/02.

16         MS. ROACH:  Where are you reading from?

17         MR. CORRIGAN:  The front of the document.

18  A.  Um, that's what it says here.

19  Q.  But then on the back it says 7?

20  A.  7/11.

21  Q.  It says 7/11.  Does it say 7/11?  What does that

22      date say?

23         MS. ROACH:  Which date?  The one on the

24      back?

1    A.    Yes.

2    Q.    Does he still work for the hospital?

3    A.    He does, yes, on a temporary basis.

4    Q.    He.works for Bulfinch, does he?

5    A.    I'm sorry.  He's a part-time employee.

6    Q.    But he works for Mass. General Hospital?

7    A.    Yes, he does.

8    Q.    Did he have attendance problems?

9    A.    Yes, he has attendance problems.

10    Q.    Had you disciplined him for those problems?

11    A.    Yes.

12    Q.    Is he presently being disciplined for the same

13          problem?

14    A.    He is on, his corrective action cycle reset itself

15          and he is currently doing well, but he went to a

16          certain step of corrective action again.

17    Q.    Do you know how far he went?

18    A.    I believe that currently he's on verbal warning.

19    Q.    Do you know how far he went before the time?

20          MS. ROACH:  Objection.

21          You can answer.

22    A.    I don't recall.  I believe he was at least written

23          warning, if not final written warning.

24    Q.    Okay.  Did you ever have an occasion before

```
 1        corrective action?

 2   A.   Initial steps of corrective action, yes.

 3   Q.   And when he worked for you, did you ever have an

 4        occasion -- by the way, did you take Mr. Williams

 5        Somers' job?

 6   A.   Well, actually now Mr. William Somers' job was

 7        taken by McHurly Louis.

 8   Q.   And then you took it?

 9   A.   And then I was the next supervisor.

10   Q.   I'm going to show you a document involving John

11        Morruzzi.  Do you recognize that document?

12   A.   I'm familiar with these documents, yes.

13   Q.   And he did receive a contact memo.  Right?

14             MS. ROACH:  Objection.

15   Q.   I'm sorry, a corrective action memo?

16   A.   Have I received this one?

17   Q.   You are aware that Mr. Morruzzi received a

18        corrective action memo?

19   A.   I'm aware of that, yes.

20   Q.   And that's the memo that says that he was tardy

21        over 40 times?

22   A.   Yes.

23   Q.   And does it say also how many times he'd been

24        absent?
```